Succession of LeBlanc.

---

## No. 9315.
### SUCCESSION OF EDGAR LEBLANC.

A widow who has lived in concubinage with a man, from whom she has had children during her widowhood, and who is considered by persons of her class as depraved—is amenable to the charge of "*notorious bad conduct,*" and should be excluded from the tutorship of her minor issue with the deceased.

The circumstance, if established, that she had ceased all intimate intercourse with her paramour, for the last eighteen months, is insufficient to show reform and to authorize the court to assume the responsibility of entrusting her with the custody of the persons and with the administration of the property of such minors—as, both would be greatly imperilled in her control.

APPEAL from the Civil District Court for the Parish of Orleans. *Houston,* J.

*E. H. McCaleb* for Appellant:

1. The causes for exclusion and removal, established by Art. 308, R. C. C., are not applicable to the mother of illegitimate children, but refer solely to the tutorship of legitimate offspring. The surviving mother is of right tutrix to her natural children duly acknowledged. R. C. C. 256. Art. 256 can only be reconciled with Art. 303, R. C. C., on the ground that the latter does not apply to the mother of illegitimate children; for the fact that a woman has given birth to a natural child disqualifies her from the tutorship because of *notorious* bad conduct. D'Aix, 24 Aout, 1809; Deleurie. T. 2, p. 283; Demolombe, T. 7, No. 485.

Succession of LeBlanc.

2. The C. N. is silent on the question of tutorship of natural children, and the jurisprudence of the French Courts is based on analogous provisions respecting legitimate children. Marcadé, T. 2, p. 190. In France, the family meeting determines the unworthiness of a person for the tutorship, but the decision is subject to appeal and review by the tribunals. C. N. 446, 447, 448. The *projet* of the C. N. prohibited the exclusion of the father or mother of legitimate children for *inconduite notoire* Locré T. 7, pp. 137 and 138. The jurisprudence of France accords with the principle recognized by Art. 256, R. C. C. "La tutelle légale d'un enfant naturel appartient de plein droit au père ou la mère qui l'a reconnu." 4 fev. 1811, Bruxelles [S. 43, 1, 281; C. N. 4, 1, 375—D. A. 8, 649]; *Id.* 24 Mars, 1813, Colmar [S. 14, 2; 2 C. N. 4, D. A. 8, 641]; 1 Septr. 1809 Toulouse, 21 Juilli 1836 Grenoble; Loiseau des Enfants Naturel, p. 537; Delvincourt t. 1, p. 425; Magnin des Minorités, t. 1, Nos. 502–4; Vazeille du Marriage, t. 2 Nos. 478, *et seq;* Marchand Code de la Minorité, p. 110; Chardon Puis. Patern, Nos. 80, *et seq ;* Cubain Droit des Femmes, 82. Where a family meeting gave the tutorship of an illegitimate child to her step-father, the decision was reversed and the administration conferred on the natural mother. Pau. 13 fev. 1822.

3. *Notorious bad conduct,* as used in Art. 238, R. C. C., is a relative, not a positive term, and in deciding a question of morality the court should consider the station in life, customs, habits and ideas of the class to which the individual belongs. "Devant la loi toutes les classes de la societé sont au même rang; mais elles ne sont pas sur la même ligne quand il s'agit d'apprécier la conduite qui résulte de leur éducation et de leur état dans le monde. Telle action d'une personne distinguée sera taxée d'inconduite notoire par un conseil de famille honorable, qui sera à peine remarquée à l'égard de toute autre personne, par un conseil de famille composé d'honnêtes proletaires. Ainsi, *sur ce point, tout depend encore de la situation des personnes dans la societe.*" Magnin des Minorités, 1–2, p. 125, No. 395; Marchand Code de la Minorité, p. 245. *A fortiori* the conduct of the applicant in this case, a colored washerwoman demanding the tutorship of her two illegitimate children, should not be measured by the rules and customs prevailing among the *elite* society of the Caucasian race; because (1) there is a vast difference between the moral standard of the negro and the white race [Encyclopœdia Britannica, verbo *Negro*]; also (2) in the legal and social *status* of mothers of legitimate and illegitimate children, as well as (3) of their offspring.

4. In order to disqualify a mother from the natural tutorship of her children, because of notorious bad conduct, the immorality complained of must be shown to exist at the time of the application or, at all events, within the *recent* and not the *remote past;* for both the civil and moral code recognize the doctrine of atonement and reformation. Marcadé, T. 2, p. 236; 36 Ann. 382; St. John, ch. viii, v. 3 to 11; Berthet C. Jeannin, Besançon, 17th Dec. 1807.

5. The evidence of notorious bad conduct should be strong and conclusive to justify a court in excluding a parent from the tutorship of a child. 5 N. S. 32; 5 R. 489; 2 Ann. 299, *et seq.*

### *Jerome Meunier* for Appellee:

1. The parent who, in his pleadings, presents such a state of facts as to show that his children are legitimate—said fact being uncontested—cannot shift his position at will to a contradictory one in order to defeat the action of the law upon it. 4 Ann. 416; 5 Ann. 18; 18 Ann. 141; 22 Ann. 368.

2. The fact that the mother of legitimate children has given birth to a natural child since the death of her husband, is irrefragable proof of *notorious bad conduct,* and of itself sufficient to exclude her from their tutorship. Cour d'Appel d'Aix, 24 août, 1809; Magnin, Traité des Minorités, T. 1, p. 125, § 397; Démolombe, T. 7, Nos. 482, 487; Paillet, C. R. 444.

3. Such proof of *notorious bad conduct* as will debar a parent from the tutorship of his children being once established, if he pleads reformation he must prove such reformation by strong affirmative evidence; or, when not possible, by irrefragable deductions from clear, definite facts or circumstances.

The opinion of the Court was delivered by

BERMUDEZ, C. J.    This is an appeal by a mother from a judgment excluding her from the tutorship of her two minor sons, on the ground of notorious bad conduct.

The appellant lived in open concubinage with the deceased, who married her two weeks before his death in 1872. She had two sons of him, one of whom, now about fifteen years, was born before, the other, now about eleven years, came to life after his death.

A number of years after the loss of her husband, the widow lived unmarried during about five years with another man, from whom she had three children, (two of whom are living) and with whom, she says, she has had no intercourse for the last eighteen months, because she would not follow him away.   Among those of her class she is considered as a woman of bad conduct.

The application of widow Edgar LeBlanc for the tutorship of her sons, to enable her to receive an inheritance of some $13,000 in the succession of their paternal grandfather, was opposed by his widow and their grandmother as an informer, to whom, it appears, the care and custody of one of them had been entrusted by the father himself, but who is not an applicant for the tutorship.

The district court sustained the opposition and excluded the mother from the tutorship.

Article 303 of the R. C. C. authorizes both the exclusion and the removal from the tutorship of minors, persons of a conduct notoriously bad, including as well fathers as mothers.  It does not discriminate between legitimate and illegitimate parents and children.   Art. 304.

This article is identical with Article 444 of the French Code.

Under the law and jurisprudence of France, the fact that a mother has given birth to a natural child since the death of her husband is *irrefragable* proof of notorious bad conduct, and suffices to exclude her from the tutorship.   Magnin, Minorité, p. 125, § 397; Demolombe V 7, Fo. 484-7; Cour d'Appel d'Aix 1809, 24 Aout.

It has, however, been held that intimacies held secret, divulged by confidential letters of the mother, whose depravation was not of a nature to inspire alarm as to the education of the children, do not constitute that notorious bad conduct which the law brands and which must

exert to justify an exclusion or a destitution from the tutorship. Bordeaux 15 pluv., an XIII; Rouen, 24 Janv., 1859; see Toullier V. 2 § 1164; Demolombe 7 § 434-6; Locré, Vol. 5 p. 166.

Under that system the mother who has thus forgotten herself is even deprived *de plano* of the custody of her children. Paris, Dec. 2, 1882; Baudry Lacantinière, t. 1, No. 882.

The father is likewise reached by the same penalty. Lyon, 4 June, 1878.

The Court of Cassation, in construing the law, has recognized in courts called upon to pass upon questions of notorious bad conduct, a very extensive discretion in the appreciation of the facts constituting the offense. Cass, 15 Mar. 1864.

It is true that an author of distinction says, and with good reason: "Devant la loi, toutes les classes de la société sont au même rang; mais elles ne sont pas sur la même ligne quand il s'agit d'apprécier la conduite qui résulte de leur éducation et de leur état dans le monde. Telle action d'une personne distinguée sera taxée d'inconduite notoire par un conseil de famille honorable, qui sera à peine remarquée à l'égard de toute autre personne, par un conseil de famille composé d'honnêtes prolétaires. Ainsi, *sur ce point, tout dépend encore de la situation des personnes dans la société.*" Maguin des Minorités, 1-2, p. 125, No. 395; Marchand, Code de la Minorité, p. 245.

But we fail to see how, by whatever standard measured, the acts of concubinage charged and proved to have lasted for years, can, for a moment, not be frowned upon judicially as a most censurable misbehavior in any class or race whatever of society.

When it is considered that—in Louisiana as in France—so jealous is the law in the protection which it extends to the persons and property of minors, it is provided that where a widow marries again, without having been previously maintained in the tutorship of her minor issue, she forfeits *ipso facto* the tutorship—the legal mind is at a loss to perceive why a widow, who misbehaves by living, unmarried, with another man, from whom she begets children, and who is considered as depraved, should be allowed to take charge of the persons and property of her legitimate issue. R. C. C. 254; C. N. 394.

In the instant case, the habits of the appellant before her marriage were bad, and since her widowhood have continued to be highly reprehensible. She is twenty-eight years old, therefore still young. She has not absolutely reformed and may persist in misbehaving, so as to endanger both the morals and property of her children.

The district judge decided correctly.

Judgment affirmed.

Rehearing refused.

### DISSENTING OPINION.

MANNING, J. I cannot concur in this opinion. The opponent and grandmother is a negress who lived in concubinage with Pierre Le Blanc a white man until within a week or two of his death in 1882 when the ceremony of marriage was gone through. Edgar Le Blanc was one of the children of this concubinage. He followed the example of his parents and lived in the same way with Louise Beattie, a mulattress, until two weeks before his death when they married. She is the applicant for tutorship of their children. If they are legitimate, she as surviving mother is entitled to their tutorship. Rev. Civ. Code, art. 250. If they are illegitimate, she is of right their tutrix. Idem, art. 256. This last provision will be nullified by the opinion of the Court in holding that art. 303, which excludes from tutorship persons of notoriously bad conduct, applies to mothers of illegitimate children. It is notorious bad conduct for a woman to have an illegitimate child, and therefore to say in the same breath that a woman is of right the tutrix of her natural child, but a woman of notorious bad conduct cannot be tutrix at all, is to utter contradictory rules.

But I think we can decide this case for the applicant without troubling ourselves in reconciling these seemingly contradictory provisions.

The evidence is that this woman Louise has lived an exemplary life for eighteen months. She has abandoned her evil course and for that period has "known no man." Four witnesses concur in giving her irreproachable character latterly. Four others it is admitted would testify in like manner if needful to offer them. They all say her conduct for a year and a half has been without blame, and her associates have been respectable for her station. The standard of morality and virtue among such people is not high. But apply the highest standard—the proof is that her conduct has been notoriously bad but that now it is notoriously good. Is she to be denied the grace of repentance and amendment? Or having repented and amended, is her previous bad conduct, not so very bad however in the estimation of her class, to be also a legal bar to the assertion of her maternal rights? See Ozanne v. Delile, 5 Mart. N. S. 32; and Kershaw's case, 5 Rob. 489.

The devolution upon these children of a considerable sum of money has provoked this contest. It seems to be assumed that their mother will waste it. Has not every lawyer's experience furnished him with examples of reputable white widows squandering the money of their children which the law permitted them to take possession of without bond? The legislature must remedy that evil. It is not our province to do it.